FILED'07 JUN 19 14:41 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLUMBIA SPORTSWEAR NORTH
AMERICA, INC.,
        Plaintiff,

CV 05-1960-PK

OPINION AND
v.                                                              ORDER

CERF BROTHERS BAG CO.,
        Defendant.
_____

PAPAK, Magistrate Judge:

       This action was originally filed by plaintiff Columbia Sportswear North America, Inc. ("Columbia"), against defendant Cerf Brothers Bag Co. ("Cerf") on December 30, 2005, alleging a single claim for breach of contract. On April 28, 2006, Columbia amended its complaint to add a second claim, for declaratory judgment.

       On June 22, 2006, Cerf amended its answer to state eleven discrete counterclaims, collectively alleging Columbia's breach of contract, breach of the implied covenant of good faith

Page 1 - OPINION AND ORDER

and fair dealing, negligent misrepresentation, unfair competition, misappropriation of trade secrets, and patent infringement, seeking declaratory judgment on two points of contract interpretation, and requesting both permanent injunctive relief and relief under a theory of promissory estoppel. Subsequently, on August 28, 2006, Columbia amended its complaint to add a claim for trademark infringement and additional claims for breach of contract.

Now before the court are the parties' cross-motions for partial summary judgment in connection with Cerf's tenth counterclaim only, alleging patent infringement. Columbia argues, as an affirmative defense to liability, that it was the beneficiary of an implied license to use Cerf's patented invention, and on that basis seeks dismissal of the counterclaim. For its part, Cerf seeks summary judgment on the narrow question of whether Columbia's use infringed specified claims of Cerf's patent, without regard to patent validity or other affirmative defenses to liability that may be available to Columbia.

This court has jurisdiction to decide the parties' motions pursuant to 28 U.S.C. § 1367. For the reasons set forth below, Columbia's motion for partial summary judgment (#94) is denied, and Cerf's motion for partial summary judgment (#99) is granted.

## FACTUAL BACKGROUND

Effective January 30, 2000, Cerf and a subsidiary of Columbia entered into an agreement (the "License Agreement"), pursuant to which the Columbia subsidiary granted Cerf the right to use Columbia's trademarked logos on various products distributed by Cerf, including backpacks; the subsidiary's rights and obligations under the License Agreement were subsequently assigned to Columbia. Paragraph 7.2 of the License Agreement provides in full as follows:

**ASSIGNMENT TO COLUMBIA.** [Cerf] irrevocably and in perpetuity assigns

>to COLUMBIA all worldwide right, title and interest in and to any artwork incorporating [Columbia's trademarked logos].  At COLUMBIA's request, [Cerf] will execute forms of assignment of all rights in such artwork.  COLUMBIA has the sole and exclusive right to use, change, license or modify such artwork, without any obligation, financial or otherwise, to [Cerf].  Artwork which qualifies as a "work-made-for-hire" under applicable copyright laws in [North America and overseas U.S. military bases] are [*sic*] agreed to be "work-made-for-hire" owned by COLUMBIA.
>
>If an artwork is made by a third party for [Cerf], [Cerf] shall obtain an assignment from such third party using [a provided form ]Artwork Assignment Agreement[], and shall use its best efforts to have such artwork made as a "work-made-for-hire."
>
>[Cerf], at its expense, shall provide COLUMBIA with reproducible materials of all such artwork within thirty (30) days of COLUMBIA's written request.
>
>This Paragraph does not give COLUMBIA any right, title or interest in or to the copyrights, trade dress or trademarks of [Cerf].

The License Agreement remained in effect from January 30, 2000, until December 31, 2005.

During the period from September to December 2002, Cory Nykoluk, a Cerf employee, designed an innovative "dry CD port" or "dry cord port" to be used in backpacks.  CD ports that permit headphone cords to enter or exit a backpack without leaving the pack partially open were at that time an available feature in some backpacks; the innovation of Nykoluk's design was that his port allowed the backpack to be substantially sealed against the elements even when the port was in use.  At the time Nykoluk developed the dry CD port on behalf of Cerf, Cerf contemplated that it would be used in a line of Columbia-branded backpacks.  All of the drawings of the dry CD port prepared by Nykoluk included a trademarked Columbia logo (variously referred to as the "diamond logo" or the "Columbia bug"), and therefore rights in these drawings were assigned to Columbia pursuant to Paragraph 7.2 of the License Agreement.

In January 2003, Cerf applied for a patent on the dry CD port, which ultimately issued

Page 3 - OPINION AND ORDER

May 10, 2005, as U.S. Patent No. 6,889,883 (the "'883 patent"). The drawings that accompanied Cerf's patent application for the CD port were prepared on the basis of Nykoluk's drawings.

In or around January 2003, Cerf provided design drawings prepared by Nykoluk to the Woo Jin Plastic Co. Woo Jin used the drawings to manufacture molds for mass production of the dry CD port. Over the remainder of the effective period of the License Agreement, Woo Jin manufactured dry CD ports utilizing Nykoluk's design and bearing the Columbia diamond logo on behalf of Cerf. At Cerf's request, these CD ports were all clearly marked as "Pat. Pend."

In 2004, before expiration of the License Agreement on December 31, 2005, Columbia initiated plans to begin designing its backpacks in-house. Columbia therefore contacted Woo Jin to select components for the backpacks. Among the components Woo Jin made available to Columbia was the dry CD port designed by Nykoluk. Columbia selected the port, and in 2006 began selling backpacks incorporating that component. The dry CD port used in Columbia's backpacks in early 2006 was made from the same molds built by Woo Jin to produce the port used in the Columbia-branded Cerf backpacks, and bore both Columbia's diamond logo and Cerf's "Pat. Pend." notation.

In April 2006, following discussions with Cerf, Columbia stopped using the accused dry CD port. Subsequently, in June 2006, Cerf filed its tenth counterclaim alleging Columbia's infringement of the '883 patent. The parties' cross-motions for partial summary judgment followed.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

Page 4 - OPINION AND ORDER

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). When considering cross-motions for summary judgment, the courts must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the non-moving party. *See* Fed. R. Civ. P. 56; *see also Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Summary judgment, of course, may not be granted where the court finds unresolved issues of material fact, even under circumstances where all parties allege that no disputed facts exist.

## ANALYSIS

I note preliminarily that, in applying the substantive law of patents, this court is bound by the decisions of the Federal Circuit to the same extent that it is bound by the decisions of the Ninth Circuit when applying "general" laws. *See Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1573 (Fed. Cir. 1984). Because the Federal Circuit expressly adopted as binding the decisions of its predecessor courts, this court is therefore also bound by the decisions of the Court of Claims and of the Court of Customs and Patent Appeals. *See South Corp. v. United*

*States*, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982) (*en banc*).

**I       Columbia's Motion**

Columbia seeks partial summary judgment as to its sixteenth affirmative defense to Cerf's tenth counterclaim, pursuant to which Columbia argues that it enjoys an implied license to use Cerf's patented dry CD port. "In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." *Wang Lab. v. Mitsubishi Elecs. Am.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997). In *Wang*, the Federal Circuit quoted with approval a 1927 decision of the Supreme Court holding that:

> No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort.

*Id.*, citing *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241 (1927).

An implied license may arise by acquiescence, by conduct, by equitable estoppel, or by legal estoppel. *See id.* Whether an implied license exists is a question of law to be determined by the court. *See Met-Coil Systems Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986).

It is Columbia's position that an implied license to use Cerf's dry CD port arose here either by legal estoppel or, alternatively, out of the parties' conduct as a shop right. For the reasons set forth below, Columbia's motion for partial summary judgment as to Cerf's tenth counterclaim is denied.

**A.       Implied License by Legal Estoppel**

Page 6 - OPINION AND ORDER

"Legal estoppel refers to . . . conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted." *Wang*, 103 F.3d at 1581; *see also Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1080 (Fed. Cir. 1987).; *AMP, Inc. v. United States*, 389 F.2d 448, 453 (Ct. Cl. 1968). In analyzing whether the patentee has "licensed or assigned a right," the courts "look[] for an affirmative grant of consent or permission to make, use, or sell: *i.e.*, a license." *Wang*, 103 F.3d at 1581.

Columbia takes the position that all three elements of legal estoppel are present here. First, Columbia argues that the assignment "to COLUMBIA [of] all worldwide right, title and interest in and to any artwork incorporating [Columbia's trademarked logos]" provided in ¶ 7.2 of the License Agreement constitutes a grant of a right to make, use, or sell the patented invention depicted in the assigned artwork. Second, Columbia argues that Cerf's tenth counterclaim, alleging patent infringement, derogates from its grant of rights in the Nykoluk artwork. Finally, Columbia argues that its performance of its obligations under the License Agreement constituted consideration for Cerf's grant of rights in the Nykoluk artwork. Except with regard to the element of consideration, *see AMP, Inc. v. United States*, 389 F.2d 448, 453 (Ct. Cl. 1968) ("elementary that [consideration received] by one party pursuant to a contract is consideration for performance of *all* the terms of the contract, and not just some of the terms") (emphasis original), this court disagrees.

A party's grant of "right, title, and interest in . . . artwork" constitutes a grant of rights under copyright rather than under patent law. Nothing in the plain language of the License Agreement suggests that Columbia's undisputed rights and interest in the design drawings

Page 7 - OPINION AND ORDER

prepared by Nykoluk extend to the useful invention depicted in those drawings. Just as copyright in a depiction of the New York Public Library is independent of and separate from any right in the structure or design of that edifice, *see, e.g., Tiffany Design v. Reno-Tahoe Specialty, Inc.*, 55 F. Supp. 2d 1113, 1119-1120 (D. Nev. 1999), so too here Columbia's rights in the Nykoluk artwork do not imply any right in the useful design illustrated therein. The License Agreement simply does not purport to make any assignment of the latter right.

The fact that the design drawings prepared by Nykoluk were used by a patent draftsman and patent attorney in preparing Cerf's application for the '883 patent does not impact this analysis. The useful design depicted in the artwork assigned to Columbia under Paragraph 7.2 of the License Agreement was not subject to copyright protection, and such use of the design drawings therefore neither violated nor expanded Columbia's rights.

Similarly, Cerf's efforts to enforce the '883 patent have not in any way derogated from Columbia's rights in the Nykoluk drawings. Columbia's title to the drawings remains intact, and Columbia remains able to exclude others from infringing its copyright therein.

For the foregoing reasons, as a matter of law, Columbia did not acquire an implied license to use the patented dry CD port by legal estoppel.

### B. Implied License by Conduct ("Shop Right")

Columbia's alternative position is that the parties' conduct regarding Columbia's use of the dry CD port gave rise to an implied license as a so-called "shop right." The elements of the shop-right doctrine were stated by the Federal Circuit in 1993 in *McElmurry v. Arkansas Power & Light Co.*, 995 F.2d 1576 (Fed. Cir. 1993). The *McElmurry* court observed that "[a] 'shop right' is generally accepted as being a right that is created at common law, when the

Page 8 - OPINION AND ORDER

circumstances demand it, under principles of equity and fairness, entitling an employer to use without charge an invention patented by one or more of its employees without liability for infringement." *Id.* at 1580 (footnotes omitted). After analyzing prior decisions, the court concluded that:

> the proper methodology for determining whether an employer has acquired a "shop right" in a patented invention is to look to the totality of the circumstances on a case by case basis and determine whether the facts of a particular case demand, under principles of equity and fairness, a finding that a "shop right" exists. In such an analysis, one should look to such factors as the circumstances surrounding the development of the patented invention and the inventor's activities respecting that invention, once developed, to determine whether equity and fairness demand that the employer be allowed to use that invention in his business.

*Id.* at 1581-1582. Specifically, the *McElmurry* court indicated that "circumstances surrounding the development of the patented invention" could give rise to a shop right where "the employer has financed an employee's invention by providing wages, materials, tools and a work place," *Id.* at 1582. The court further indicated that "the inventor's activities respecting that invention, once developed" could create a shop right where an inventor employee gave "consent, acquiescence, inducement, or assistance to the employer in using the invention without demanding compensation or other notice of restriction." *Id.*

Accepting *arguendo* Columbia's contention that, post-*McElmurry*, a "shop right" may arise outside the employment relationship, the elements of the doctrine are wholly absent here. First, Columbia did not in any sense finance the development of the dry CD port. Columbia did not pay Nykoluk's wages while the port was developed, nor did it provide him with materials, tools, or a workplace. At all material times, Nykoluk's wages and workplace were provided by his employer, Cerf. Moreover, Cerf's benefits under the License Agreement were not directly

Page 9 - OPINION AND ORDER

related to the development of the dry CD port, which was undertaken at Cerf's initiative.

Second, the record before this court is void of any evidence that Cerf acquiesced in Columbia's use of the dry CD port. To the contrary, the record suggests that Cerf took reasonable action to prevent Columbia from continuing its allegedly infringing use soon after it learned that Columbia was marketing backpacks incorporating the port. Neither Woo Jin's decision to make Cerf's patented port available for Columbia's use nor the License Agreement's grant of rights in artwork constitutes the requisite acquiescence.

For the foregoing reasons, as a matter of law Columbia did not acquire a shop right to use the patented dry CD port.

## II    Cerf's Motion

In its motion for partial summary judgment, Cerf requests this court's ruling on the narrow question of patent infringement only. Cerf acknowledges that an order in its favor would leave undecided all other issues in connection with Columbia's liability, including the validity of the '883 patent or any other affirmative defenses Columbia may assert. The parties do not dispute that the dry CD port Columbia incorporated into some of its backpacks in early 2006 is a precise duplicate of the commercial embodiment of Cerf's patented port, produced by the same manufacturer from the same molds used to produce Cerf's embodiment. Cerf argues that, under these circumstances, Columbia's product necessarily infringes Claims 1-5 and 8-11 of the '883 patent. For the reasons set forth below, this court agrees, and Cerf's motion is therefore granted.

### A.    Discrete Legal Issue

This court can decide the question of patent infringement separately and independently from the question of Columbia's *liability* for such infringement. *See Pandrol USA, LP v. Airboss*

Page 10 - OPINION AND ORDER

*Ry. Prods.*, 320 F.3d 1354, 1365 (Fed. Cir. 2003); *see also Scosche Indus. v. Visor Gear, Inc.*, 121 F.3d 675, 679 (Fed. Cir. 1997) (a party does not waive its right to assert invalidity as a defense by offering a Rule 68 judgment admitting infringement); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983) ("Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity").

### B.  Infringement

"A determination of infringement requires a two-step analysis. First, the court determines the scope and meaning of the patent claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Abraxis Bioscience, Inc. v. Mayne Pharma Inc.*, 467 F.3d 1370, 1375 (Fed. Cir. 2006). The first step, often referred to as "claim construction," is a matter of law to be undertaken by the court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*). Comparison of the construed claims with the allegedly infringing device is generally treated as a question of fact. *See Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004).

#### 1.  Procedural Requirements

Despite Columbia's contrary assertion, it is well established that district courts are not required "to follow any particular procedure in conducting claim construction." *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352 (Fed. Cir. 2001).

> To perform that task, some courts have found it useful to hold hearings and issue orders comprehensively construing the claims in issue. Such a procedure is not always necessary, however. If the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all the other issues presented by the parties. District courts have wide latitude in how they conduct the proceedings before them, and there is nothing

> unique about claim construction that requires the court to proceed according to any particular protocol. As long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best.

*Id.* (emphasis supplied); *see also Markman*, 52 F.3d at 981 (affirming that claim construction can take place "in the context of dispositive motions such as those seeking judgment as a matter of law"). Because the claims at issue here can be construed to the extent necessary to determine whether Columbia's use infringed the '883 patent without reference to extrinsic evidence of any kind, this court may undertake claim construction in the course of deciding Cerf's dispositive motion.

### 2. Legal Standards

#### a. Sources of Evidence

To construe the claims of a patent, the district court looks primarily to three sources: the claims, the specification, and, if entered into evidence, the prosecution history. *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991). In some cases, the court may rely on other, extrinsic evidence (including expert testimony), in interpreting these sources of intrinsic evidence. *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed. Cir. 1987). However, "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

#### b. Scope

The district courts construe patent claims only to the extent necessary to resolve the dispute at issue between the parties:

> The *Markman* decisions do not hold that the trial judge must repeat or restate

Page 12 - OPINION AND ORDER

> every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.

*United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *see also Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *Maytag Corp. v. Electrolux Home Prods.*, 411 F. Supp. 2d 1008, 1036 (D. Iowa 2006) (to "construe terms to a greater extent than necessary to resolve the present controversy" "would . . . constitute an impermissible advisory opinion"). Indeed, the Federal Circuit has acknowledged that where there is no dispute as to the meaning of a patent's claims, the claim construction process may be omitted entirely. *See PSC Computer Prods., Inc. v. Foxconn Int'l*, 355 F.3d 1353, 1356 (Fed. Cir. 2004) (approving decision to omit claim construction phase where there was no dispute as to the meaning of the claims); *see also Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 737-738 (D. Tex. 2005) (observing that "although every word used in a claim has a meaning, not every word requires a construction" and specifically holding that "terms . . . used in accordance with their ordinary lay meanings" do not require construction).

### c. Claim Language

When construing claims, the analysis begins with, and must focus on, the language of the claims themselves. *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). The words of a claim "are generally given their ordinary and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art in

Page 13 - OPINION AND ORDER

question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005) *(en banc)* (citations omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

If the claim language is clear on its face, then the rest of the intrinsic evidence is considered only for whether any deviation from the plain meaning is specified. *See Interactive Gift*, 256 F.3d at 1331. Deviation may be warranted if, for example, the patentee has "chosen to be his own lexicographer," or if the patentee has disclaimed a certain portion of the claim scope that would otherwise be afforded by the plain meaning. *Id.* (citations omitted). Where the claim language is not clear, other intrinsic evidence may be considered to resolve the lack of clarity. *See id.*

Where the ordinary meaning of a claim term is not be readily apparent, the context in which a word appears in a claim will inform the construction of that word. *See Phillips*, 415 F.3d. at 1314. Similarly, other claims of the patent in question "can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.* Because claim terms are normally used consistently throughout the patent, "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *Id.* at 1315.

In addition, where a term has more than one common meaning, the patent disclosure "serves to point away from the improper meanings and toward the proper meanings."

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1300 (Fed. Cir. 2003) (citation omitted). If more than one definition is consistent with the usage of a term in the claims, the term may be construed to encompass all consistent meanings. *See Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed. Cir. 2002).

### d. Specification

Patent claims must be read in light of the specification. *See Markman*, 52 F.3d at 979. The specification "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. Where a claim term has multiple yet potentially consistent, definitions, the rest of the intrinsic record, beginning with the specification, provides further guidance. *See Brookhill-Wilk*, 334 F.3d at 1300. If the patentee acted as his own lexicographer by explicitly defining a claim term in the specification, the term is construed according to the provided definition rather than the ordinary meaning of the term. *See CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Moreover, the specification may define a term by implication. *See Phillips*, 415 F.3d at 1321. The specification may also function to limit the claims' scope by indicating that the invention and all of its embodiments fall within only a narrow portion of the potentially broader meaning of a claim term. *See SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).

It is error, however, to impute to the claim a limitation merely inferred from the embodiments described in the specification. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905 (Fed. Cir. 2004). Without more, an embodiment disclosed in the specification may not limit the claims. *Id.* at 906. Even when the specification describes only a single embodiment, the claims of the patent are not to be construed as restricted to that embodiment unless the

patentee demonstrates a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Absent clear statements of scope, courts are constrained to follow the language of the claims and not that of the written description provided by the specification. *See id.* at 1328; *see also Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988).

Absent extraordinary circumstances, by contrast, claims should be construed so as to include within their scope any preferred embodiment described in the specification. *See, e.g., Vitronics*, 90 F.3d at 1583 ("an interpretation [pursuant to which the preferred embodiment falls outside the scope of the claims] is rarely, if ever, correct and would require highly persuasive evidentiary support"); *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) ("it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way").

### 3. Analysis

Independent Claim 1 of the '883 patent describes:

A bag having a closure such that the bag may be substantially closed to the outside environment comprising:

> a CD port attached to the bag comprising:
>
>> a bottom portion comprising two raised portions each defining opposing inner sides, the bottom portion further defining a cutout portion;
>>
>> a resilient top portion defining two opposed outer sides having a shape that generally conforms to a shape of the opposed inner sides of the raised portions of the bottom portion.

Dependent Claims 2 and 3 describe the bag of Claim 1 with additional characteristics

relating to how the CD port is sewn to the bag. Dependent Claim 4 describes the bag of Claim 1 with the further particularity that the "opposed outer sides" of the CD port, rather than "generally conform[ing] to a shape of the opposed inner sides of the raised portions of the bottom portion," more specifically:

> comprise[] generally inwardly arcing sides such that when the top portion is placed between the raised portions of the bottom portion, the top portion is generally locked into position therebetween.

Dependent Claim 5 describes the bag of Claim 1 with the further particularity that "the periphery of the bottom portion generally corresponds to the shape of an obround."

Independent Claim 6 and dependent Claim 7 describe variants on a CD port with a means of attaching the top and bottom portions that differs from that used in the CD ports described in Claims 1-5. Cerf does not argue that Columbia's use infringed these two claims.

Independent Claim 8 describes the CD port incorporated in the bag of Claim 1 with the characteristics described in Claim 3, and independent Claim 10 describes the CD port incorporated in the bag of Claim 4. Dependent Claims 9 and 11 describe the CD ports respectively of Claims 8 and 10, with the same further particularity as for Claim 5, namely, that "the periphery of the bottom portion generally corresponds to the shape of an obround."

The preferred embodiment described in the specification and the patent figures corresponds to the bag described in Claim 1, its CD port displaying each of the further particularities described in dependent Claims 4 and 5 and affixed to the bag using each of the means described in dependent Claims 2 and 3.

On the facts in the record, it is clear that no reasonable construction of Claims 1-5 and 8-11 could exclude Columbia's use. The evidence establishes that Cerf's commercial embodiment

Page 17 - OPINION AND ORDER

was manufactured according to specifications identical to those set forth in the description of the preferred embodiment and illustrated in the patent figures. Moreover, Columbia concedes that its dry CD port was identical to Cerf's commercial embodiment. Finally, the record before the court is void of evidentiary support for the conclusion that the preferred embodiment could be excluded from the scope of the claims. *See, e.g., Vitronics*, 90 F.3d at 1583; *Hoechst Celanese*, 78 F.3d at 1581.

Columbia adopts the position that there could be a dispute as to the construction of three terms appearing in independent Claim 1: "a bottom portion comprising two raised portions each defining opposing inner sides," "a top portion defining two opposed outer sides," and "a shape that generally conforms to a shape of the opposed inner sides of the raised portions of the bottom portion." Columbia suggests that this court could reasonably construe these terms so as to exclude the preferred embodiment; however, Columbia fails to propose any construction for any of the three terms that might effect such a result. Moreover, the ordinary and customary meaning of the words used in the allegedly disputable terms is readily apparent, and suggests no interpretation that would not include the preferred embodiment. *See Phillips*, 415 F.3d at 1312-1314. No intention to deviate from such ordinary and customary meaning is suggested in the patent specification or prosecution history. Because the meaning of the claim language is clear from analysis of the intrinsic evidence, this court may not properly look to extrinsic evidentiary sources to supplement its analysis. *See Vitronics*, 90 F.3d at 1583.

At oral argument, but not in the briefs Columbia submitted to the court, Columbia suggested that Cerf's commercial embodiment could be distinguished from the preferred embodiment described in the specification. Specifically, Columbia indicated that the patent

Page 18 - OPINION AND ORDER

figures show a top portion with partially straight sides, whereas the top portion of the commercial embodiment has sides that are arguably curved over a greater proportion of their length. The indicated distinction, to the extent perceptible, appears however to be an artifact of the two-dimensionality of the patent figures. Moreover, because the claim language does not specify whether the opposed outer sides of the top portion are partially straight or wholly curved, but requires only that they be opposed to one another, the putative distinction cannot reasonably support a construction whereby Columbia's use could be non-infringing.

Because under any reasonable construction Claims 1-5 and 8-11 necessarily include the accused dry CD port, this court will not issue an advisory opinion by undertaking to construe the claim terms with greater specificity than necessary to resolve the instant dispute. *See Vivid Techs.*, 200 F.3d at 803; *Maytag*, 411 F. Supp. 2d at 1036.

For the foregoing reasons, Columbia's use of the dry CD port necessarily infringed Claims 1-5 and 8-11 of the '883 patent. Cerf is therefore entitled to partial summary judgment as a matter of law as to the narrow issue of infringement of these claims only.

## CONCLUSION

For the reasons set forth above, Columbia's motion for partial summary judgment as to its implied license affirmative defense to Cerf's tenth counterclaim (#94) is denied, and Cerf's

///

///

///

///

///

motion for partial summary judgment in connection with its tenth counterclaim, as to Columbia's infringement of Claims 1-5 and 8-11 of the '883 patent only (#99), is granted.

Dated this 19th day of June, 2007.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge